UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

---

JANE M. JUZA,

                    Plaintiff,

          v.                                              Case No. 17-C-439

NANCY A. BERRYHILL,
Acting Commissioner of Social Security,

                    Defendant.

---

## DECISION AND ORDER

---

This is an action for judicial review of the final decision of the Commissioner of the Social Security Administration (SSA) denying plaintiff's application for Disability Insurance Benefits (DIB) and Supplemental Security Income (SSI) under Titles II and XVI of the Social Security Act. 42 U.S.C. § 405(g). Plaintiff Jane Juza challenges the Administrative Law Judge's (ALJ's) decision denying her benefits. For the reasons given below, the decision of the Commissioner will be affirmed.

## BACKGROUND

On April 19, 2013, Juza filed an application for DIB and SSI, claiming she was under a disability as of November 11, 2012, due to learning disability (LD), attention deficit hyperactivity disorder (ADHD), and depression. R. 62, 310. At the time of her application, Juza was taking no prescription or non-prescription medications. R. 312. She listed Prevea Health-East Mason Health Center as the facility where she received treatment and named Dr. Paul Prichard as the health care professional who treated her for the conditions that limited her ability to work and from whom

medical records about her conditions could be obtained. R. 313. SSA requested relevant records from Prevea, but its request was returned with the notation "We do not have the information requested." R. 470–72.

The Agency did receive a May 14, 2013 initial psychiatric evaluation from the Brown County Community Treatment Center. R. 515–16. Juza told a therapist there that she thought she had attention deficit disorder. She stated she had problems with school since childhood which persisted into her college education. She reported she took 25 years to complete a four-year degree. She had problems in the classroom setting maintaining focus and had to reread or restudy all of the material when she got home. She said she managed to get through school by very hard work and determination. She reported she also had problems with procrastination and motivation, and felt she could not focus for long periods of time. Staff psychiatrist B. J. Eggener noted Juza was somewhat vague about other symptoms she might be currently experiencing. She stated she had never been on psychotropic medications and had never previously been diagnosed with ADD or any other psychiatric illness. R. 515. Dr. Eggener noted on his mental status examination that Juza was alert, pleasant, and cooperative. She was appropriately groomed with adequate hygiene and appropriate dress. She did not show any significant attention problems during the course of the interview, but was a little hesitant and vague at times. Dr. Eggener found no evidence of thought disorder, no perceptual disturbances, and no abnormal thought content. Her immediate, short-term, and long-term memory were intact, and her language, expression, and comprehension were normal. Dr. Eggener diagnosed Juza with attention deficit disorder, residual type, and assessed her GAF at 55-65. *Id.* He noted that as an asset, Juza had "good health." R. 516. He started her on Adderall and told her to follow-up in 4-6 weeks or as needed. *Id.*

Unable to determine the extent of any impairment from the information available, the Agency arranged for a psychological consultative examination by psychologist Steve Krawiec. R. 65–67, 474–79. Juza reported to Dr. Krawiec that she had held lots of jobs but was generally let go because she "didn't fit." R. 474. Juza said she generally got along well with others and had never had a confrontation with other employees. She said that she had tried to get into medical school for ten years and took a test to get into nursing school eleven times. She reported she had three college degrees, including one in human biology, one in chemistry, and the third in human development, but had never worked in any of these fields. Based on his evaluation and testing, Dr. Krawiec issued a report on September 16, 2013, in which he diagnosed Juza with depressive and attention deficit disorders not otherwise specified. Dr. Krawiec concluded that Juza had the cognitive capacity to manage simple job instructions. He noted that she did not display any notable difficulty with attention, concentration, or memory during the evaluation he completed with her, but had a little trouble with a short-term memory task. Dr. Krawiec stated that "persisting at tasks and maintaining adequate pace might be difficult to the degree that ADHD symptoms would interfere there." R. 478. He did not know, however, the degree such symptoms would interfere with job activities and whether medication would ameliorate any difficulty that arose.

A state consultative psychologist, Dr. David Biscardi, also reviewed the record on September 24, 2013, including Dr. Krawiec's report, and concluded that Juza "retained the capacity to understand, remember, carry out and sustain performance of 1-3 step tasks (but would become overwhelmed if the procedures were more complicated), complete a normal workday, interact briefly/superficially with coworkers/supervisors and adopt to changes/stressors associated with simple routine competitive work activities." R. 73. Based on these reports and the entire record,

3

the Agency determined Juza could return to her past work as a produce clerk and denied her application on September 25, 2013. R. 74–76.

After the initial denial of her application, Juza then added back pain dating back to 2005 as an impairment and sought reconsideration, claiming she had arthritis in her low back. R. 174. Juza stated that because of her back pain, she could not sit long periods or drive long distances without having to stop and get out of the car, and that she definitely could not repeatedly lift boxes or bend down to pick things up and move them. *Id.* She further stated that she had pain every night when she laid down in her bed and could not stand and walk for long distances without being in pain. She said she was in a lot of pain when she got down on her hands and knees to scrub the floor and could no longer use exercise machines because they gave her low back pain. She claimed she had difficulty standing up after sitting and had to put her hand on her back to help her stand and walk. She said she could not work a lifting job and should be on pain pills but did not have insurance. Nevertheless, she reported that every day she took ibuprofen and used pain patches to get her through the day. *Id.*

The Agency again requested medical records from Prevea based on her new claim. R. 483. The only record the Agency received in response was a report showing that Juza reported to the Emergency Department on January 19, 2014, with a complaint of a sore throat which she said had made it difficult for her to eat or drink for the past 1-2 months. R. 485. For her past medical history, she reported a motor vehicle accident in April 2006 that caused left shoulder and neck pain. She also claimed an MRI at the time showed bulging discs in her cervical spine at C5-6 and C6-7. R. 485–86. No other physical problems, past or present, were listed.

The Agency then arranged for a consultative physical examination by Dr. Kevin Rosteing at Mercy Family Practice clinic in De Pere. R. 493–506. Juza reported to Dr. Rosteing that she had low back pain/arthritis with onset of symptoms around 2007–2008. She stated she had x-rays and an MRI of her lumbar spine at Prevea Clinic and was told that the MRI showed a tear in a lumbar disc. R. 493. Juza reported her back pain was central and moves to the left buttock with radiation down the thigh or leg. She said it was worsened by prolonged sitting and lifting and reported she was on ibuprofen and had been on Vicodin and Tramadol previously. *Id.* Based on what appears to have been a lengthy interview and his physical examination, Dr. Rosteing issued a report on March 27, 2014, diagnosing Juza with lumbrosacral pain. Although he noted he did not have any medical records of previous treatment or the MRI Juza described, Dr. Rosteing stated his examination showed "she has point tenderness in the lower lumbar area around L5-S1, and this limits her ability to flex at the lower lumbar spine." R. 506. His impression was that she had either a degenerative disc of the lower spine, or facet joint disease, though without nerve impingement. Nevertheless, Dr. Rosteing concluded that her pain limited Juza's ability to walk in a normal pace and sit for prolonged periods. He stated she would not be able to return to work as a CNA, "which requires occasional lifting or assisting of residents, stooping to pick up items, to wait on tables, to lift and carry garbage, etc." *Id.* Noting that she had a masters degree, Dr. Rosteing thought it was possible Juza could find a job that would not place demands on the lower spine and that she would be able to work at least part time. *Id.*

The Agency then ordered x-rays of Juza's lumbar spine and requested a comparison with x-rays taken of her spine in July 2008. Dr. Ryan Pierce, a radiologist, reviewed the x-rays and found

the vertebral bodies generally preserved. He saw no evidence of acute fracture or acute malalignment, but noted a loss of intervertebral disc height at L3-L4 and L5-S1. R. 512.

A state agency consultative physician, Dr. Bernard Stevens, reviewed the record, including Dr. Pierce's report, and concluded Juza was capable of light work with some relatively minor postural limitations. Dr. Stevens thought Juza could climb ramps/stairs only frequently, as opposed to being unlimited. She could also stoop (bend at the waist), crouch (bend at the knees), kneel, and crawl frequently. She could climb ladders/ropes/scaffolds only occasionally. R. 184–85. When Juza's application was again denied on reconsideration, she requested an administrative hearing. R. 190.

ALJ Robert L. Bartlet, Jr., conducted a hearing on December 2, 2015 at which Juza (appearing without an attorney), a medical expert, and a vocational expert testified. R. 25. At the hearing, Juza, who was 54 years old at the time, testified that she lived alone in her apartment. R. 29. She obtained bachelors degrees in human biology, chemistry, and human development from the University of Wisconsin–Green Bay. R. 31. Her employment from 2000 to 2012 included work as a nurse's aide, a home attendant, a stock clerk, a counter clerk, and a secretary. Juza testified that her interstitial cystitis and her back problems prevent her from working. R. 41. She also claimed she has depression and ADHD. R. 44.

In a decision dated February 12, 2016, the ALJ determined Juza was not disabled. R. 12–18. The ALJ concluded Juza met the insured status requirements through December 31, 2015 and had not engaged in substantial gainful activity since November 11, 2012, the alleged onset date. The ALJ found Juza's only severe impairment was disorder of the back/spine. R. 14. He concluded Juza's carpal tunnel syndrome, depressive disorder, and ADHD were nonsevere. At step three, the

6

ALJ determined that Juza's back/spine disorder did not meet or medically equal any listed impairments in 20 C.F.R. § 404, Subpart P, Appendix 1. R. 16. The ALJ concluded Juza has the residual functional capacity (RFC) to perform the full range of light work as defined in 20 C.F.R. § 404.1567(b) and § 416.967(b). *Id.* He found Juza is capable of performing past relevant work as a nurse's aide, home attendant, and stock clerk. R. 18. Based on these findings, the ALJ concluded Juza was not disabled within the meaning of the Social Security Act. *Id.* The ALJ's decision became the final decision of the Commissioner when the Appeals Council denied Juza's request for review on January 24, 2017. R. 1. Thereafter, Juza commenced this action for judicial review.

## LEGAL STANDARD

The Commissioner's final decision will be upheld if the ALJ applied the correct legal standards and supported his decision with substantial evidence. 42 U.S.C. § 405(g); *Jelinek v. Astrue*, 662 F.3d 805, 811 (7th Cir. 2011). Substantial evidence is "such relevant evidence as a reasonable mind could accept as adequate to support a conclusion." *Schaaf v. Astrue*, 602 F.3d 869, 874 (7th Cir. 2010). Although a decision denying benefits need not discuss every piece of evidence, remand is appropriate when an ALJ fails to provide adequate support for the conclusions drawn. *Jelinek*, 662 F.3d at 811. The ALJ must provide a "logical bridge" between the evidence and conclusions. *Clifford v. Apfel*, 227 F.3d 863, 872 (7th Cir. 2000).

The ALJ is also expected to follow the SSA's rulings and regulations in making a determination. Failure to do so, unless the error is harmless, requires reversal. *Prochaska v. Barnhart*, 454 F.3d 731, 736–37 (7th Cir. 2006). In reviewing the entire record, the court does not substitute its judgment for that of the Commissioner by reconsidering facts, reweighing evidence, resolving conflicts in evidence, or deciding questions of credibility. *Estok v. Apfel*, 152 F.3d 636,

638 (7th Cir. 1998). Finally, judicial review is limited to the rationales offered by the ALJ. *Shauger v. Astrue*, 675 F.3d 690, 697 (7th Cir. 2012) (citing *SEC v. Chenery Corp.*, 318 U.S. 80, 93–95 (1943); *Campbell v. Astrue*, 627 F.3d 299, 307 (7th Cir. 2010)).

## ANALYSIS

### I. Waiver of the Right to Counsel

DIB and SSI claimants have a statutory right to be represented by counsel in the SSA's administrative proceedings pursuant to 42 U.S.C. § 406(a)(1) and 20 C.F.R. § 404.1700. A claimant may, of course, waive her right to an attorney, but the Seventh Circuit has held that for the waiver to be valid, the claimant must be advised of: "(1) the manner in which an attorney can aid in the proceedings; (2) the possibility of free counsel or a contingency arrangement; and (3) the limitation on attorney's fees to twenty-five percent of past due benefits and required court approval of the fees." *Binion v. Shalala*, 13 F.3d 243, 245 (7th Cir. 1994) (citing *Thompson v. Sullivan*, 933 F.2d 581, 584 (7th Cir. 1991)).

At the hearing, the ALJ asked whether Juza had considered whether she wanted a lawyer or if she had talked to any attorneys about the matter. Juza responded that she had "considered it but never had any luck with lawyers." The ALJ then asked whether Juza was comfortable going ahead on her own without a lawyer, to which Juza answered "yes." R. 27. Thus, Juza correctly notes that the ALJ did not personally explain the advantages of counsel or her payment options at the hearing.

The Commissioner asserts, however, that Juza received the information needed for an informed waiver of her right to counsel when she received from SSA a pamphlet entitled "Your Right to Representation," along with her notice of hearing. R. 247–55. This pamphlet describes ways in which a representative could aid a claimant, explains the possibility of free counsel or a

8

contingency arrangement, and notes that the SSA would only approve a fee agreement if the fee is no more than 25 percent of past-due benefits or $6,000, whichever is less. R. 254–55. The ability to obtain free legal advice and the possibility of retaining a lawyer on a contingency fee basis with any fee subject to the limitation of 25% of past due benefits and court approval is also explained in other documents that were sent to Juza. R. 235, 240.

Juza argues that this is not enough to show a valid waiver. Citing several district court decisions, she contends that the ALJ must personally "provide an appropriate explanation" to the claimant, or at least confirm from the claimant that she received, read, and understood the "Your Right to Representation" pamphlet sent to her prior to the hearing. ECF No. 20 at 2 (citing *Henderson v. Barnhart*, 205 F. Supp. 2d 999, 1010 (E.D. Wis. 2002); *Davis ex rel. J.E.C. v. Colvin*, No. 14-C-104, 2014 WL 4954470, at *7 (E.D. Wis. Oct. 2, 2014); *Seamon v. Barnhart*, No. 05-C-13-C, 2005 WL 1801406, at *10 (W.D. Wis. July 29, 2005) ("I conclude that mailing written notices to plaintiff could satisfy the commissioner's burden, but only if the ALJ establishes at the hearing that the claimant received, read and understood the notices.").

In *Skinner v. Astrue*, the Seventh Circuit held that a written notice sent to the claimant did not support a finding that she waived her right to have an attorney represent her because, as the Commissioner conceded, the notice in that case did not comport with the circuit's requirements for establishing a valid waiver. 478 F.3d 836, 841 (7th Cir. 2007). Here, however, there is no dispute that the Agency's "Your Right to Representation" pamphlet contains all of the information required. Nor is there any real issue as to whether Juza received it. The pamphlet was attached to the Notice of Hearing that advised her of the date and place of the hearing. Since she appeared at the time and place of the hearing, it is safe to assume she received the notice and the attached pamphlet, and Juza

does not claim otherwise. The only question remaining as to this issue is whether the ALJ is required to provide the same information at the hearing in order to obtain a valid waiver. I conclude the ALJ need not do so.

In *Skinner*, in addition to challenging the waiver of her right to an attorney, the plaintiff also claimed that she had not validly waived her right to appear in person at the hearing. The plaintiff argued that her waiver of her right to appear was ineffective because "she did not receive a proper explanation of the significance of appearing in person at an oral hearing and the possible consequences of waiving her personal appearance and allowing the case to be decided on the written record." *Id.* at 842. As a result, she argued, the ALJ had failed to fully and fairly develop the record. *Id.* In rejecting this argument, the court relied upon the written notices the plaintiff had received advising her of her right to appear at the hearing and the possible advantages of doing so, along with her signed waiver acknowledging the same. The court found the plaintiff's suggestion that "the ALJ should have advised her of the possibility of appearing by video teleconference, as well as the possibility that her appearance might prove 'essential' to her claim [was] without merit." *Id.*

I reach the same conclusion here. Juza was provided in writing all of the information required by the court to permit a valid waiver of her right to have an attorney represent her at the hearing. There is no reason to believe she did not fully understand it. The information is provided in easy-to-understand language, and Juza has three college degrees. Moreover, when the ALJ asked her if she had talked to any lawyers or considered having a lawyer represent her, her response did not suggest that she could not afford an attorney or didn't understand what an attorney can do. Instead, she acknowledged that she had considered having an attorney represent her but decided not

10

to because she "had never had any luck with lawyers." R. 27. This is enough to show a valid waiver.

## II. Development of the Record

"It is a well-settled proposition regarding social security disability hearings is that '[i]t is a basic obligation of the ALJ to develop a full and fair record.'" *Thompson*, 933 F.2d at 585 (quoting *Smith v. Sec'y of Health, Educ. & Welfare*, 587 F.2d 857, 860 (7th Cir.1978)); *see also Smith v. Apfel*, 231 F.3d 433, 437 (7th Cir. 2000) ("Although a claimant has the burden to prove disability, the ALJ has a duty to develop a full and fair record."). This obligation exists even where the claimant is represented by counsel, but rises to a special duty for unrepresented claimants unfamiliar with the hearing process. *Id.* at 586 (citing *Kane v. Heckler*, 731 F.2d 1216, 1219 (5th Cir. 1984)). "The ALJ's duty to develop the record fully and fairly where the claimant proceeds without counsel is met if the ALJ probes the claimant for possible disabilities and uncovers all of the relevant evidence." *Binion*, 13 F.3d at 245.

Where, as here, a claimant has waived her right to have an attorney represent her, the burden is on the claimant to show that the ALJ failed to fulfill this duty. *Id.* A significant omission is usually required before the court will find that the Secretary failed to assist pro se claimants in developing the record fully and fairly. *Luna v. Shalala*, 22 F.3d 687, 692 (7th Cir. 1994). "And an omission is significant only if it is prejudicial." *Nelms v. Astrue*, 553 F.3d 1093, 1098 (7th Cir. 2009) (citing *Nelson v. Apfel*, 131 F.3d 1228, 1235 (7th Cir. 1997)). "Mere conjecture or speculation that additional evidence might have been obtained in the case is insufficient to warrant a remand." *Binion*, 13 F.3d at 246. "Instead a claimant must set forth specific, relevant facts—such as medical evidence—that the ALJ did not consider." *Nelms*, 553 F.3d at 1098.

Juza contends that the ALJ failed to adequately develop the record in this case because he failed to obtain medical records concerning her interstitial cystitis, additional mental health records of her ongoing treatment with Dr. Koti Mannem at the Brown County Community Treatment Center, and records of treatment for her carpal tunnel syndrome dating from 2007 with Dr. Paul Prichard. ECF No. 13 at 9. It appears neither Juza's interstitial cystitis, nor her carpal tunnel syndrom were identified as impairments by Juza prior to the hearing. It is true that Juza did identify interstitial cystitis, back problems, and mental health problems as the conditions that prevented her from working at the hearing. R. 41–44. She also testified that she had been treated for carpal tunnel syndrome in the right wrist since 2007 and was starting to experience it in the left wrist. R. 50–51. But the record contains no medical evidence showing diagnosis or treatment for either carpal tunnel syndrome or interstitial cystitis. In fact, Juza denied any difficulties with frequent or painful urinating when she underwent a physical evaluation with Dr. Rosteing on March 27, 2014, even though she testified to having the condition since 2003. R. 46, 496. Nevertheless, it is possible that there exist additional records that might provide medical evidence of these conditions and additional functional impairments.

The problem with Juza's argument, however, is that she has failed to show that such evidence does exist. Unlike the plaintiff in *Nelms*, she has failed to file with the court copies of the medical records she claims exist. In *Nelms*, the plaintiff filed with the court a separate appendix of medical records for the limited purpose of demonstrating prejudice. 553 F.3d at 1098. That evidence supported the plaintiff's claim that the ALJ likely would have found him disabled had he considered them. In this case by contrast, Juza, now represented by counsel, merely criticizes the ALJ for not seeking out additional records of conditions that weren't even alleged to have caused her disability

12

until the day of the hearing. She offers "mere conjecture or speculation" that additional evidence might have been obtained in the case that would be sufficient to warrant a remand. *Binion*, 13 F.3d at 246. That is not enough to show prejudice, especially after the Agency had already ordered consultative physical and psychological evaluations to assess her condition. It makes little sense to remand a case to consider additional evidence absent some indication that the unconsidered evidence would make a difference.

### III. RFC Assessment

Juza argues that the ALJ erred in formulating her RFC. The RFC represents "the maximum a person can do—despite [her] limitations—on a 'regular and continuing basis,' which means roughly eight hours a day for five days a week." *Pepper v. Colvin*, 712 F.3d 351, 362 (7th Cir. 2013) (quoting SSR 96–8p). The ALJ alone is responsible for creating the RFC. 20 C.F.R. §§ 404.1545(a); 404.1527(d)(2). In formulating the RFC, an ALJ must review all of the relevant evidence in the record, including any information about the claimant's symptoms and any opinions from medical sources about what she can still do despite her impairments. SSR 96–8p, 1996 WL 374184, at *2. Here, Juza contends that "the ALJ impermissibly constructed the RFC by relying on his lay opinion rather than the conclusions of the medical professionals." ECF No. 13 at 10. Juza also contends that the ALJ failed to properly assess her subjective complaints of pain.

Juza did not present an opinion from a treating physician regarding any limitations caused by her back pain. Dr. Kevin Rosteing, a consultant who independently examined Juza in connection with her application for SSI on March 27, 2014, opined that Juza would not be able to return to work as a certified nursing assistant, but she could work at least part-time in a job that did not place demands on her lower spine. R. 506. The ALJ gave Dr. Rosteing's opinion little weight because

it appeared to be "based at least in part on Juza's report of an MRI showing a 'tear' in her lumbar spine." R. 17. The ALJ noted that Dr. Rosteing did not review any MRI report, and no such report was ever produced. R. 17. Dr. Rosteing also didn't review the x-ray report; indeed, as Dr. Rosteing noted, he did not have any records of any care or treatment and thus relied entirely upon Juza for a history. R. 505. The ALJ also noted that despite Dr. Rosteing's diagnosis of either degenerative disc disease of the lower lumber spine or facet joint disease, the record contained no evidence of treatment for Juza's claimed back impairment in the nearly two years that had passed since Dr. Rosteing's examination. R. 17. In fact, in the only record of a physical examination that pre-dated the Dr. Rosteing's examination, the January 2014 record of her emergency visit to St. Vincent Hospital for a sore throat, Juza had reported a 2006 injury to her cervical spine. R. 489. Finally, the ALJ also discounted Dr. Rosteing's opinion because he did not offer a function-by-function assessment of Juza's abilities and his part-time limitation was not supported by his minimal exam findings. R. 17. Under these circumstances, it was hardly unreasonable for the ALJ to accord Dr. Rosteing's opinion little weight, especially considering she did not even list her back problem as an impairment until after her initial denial.

In addition, the ALJ gave partial weight to state agency consultant Dr. Bernard Stevens' opinion that Juza could perform light work with only occasional climbing of ladders, ropes, or scaffolds and frequent performance of other postural activities, such as climbing ramps/stairs, stooping (i.e., bending at the waist), kneeling, couching (i.e., bending at the knees), and crawling. R. 166. The ALJ noted the light work limitation was supported by x-rays and Dr. Rosteing's examination but found that the postural limitations were not supported in light of Juza's lack of treatment and active lifestyle. R. 17. He therefore concluded Juza could perform the full range of

light work. Juza asserts the ALJ improperly relied upon her activities of daily living to conclude that she could perform light work without the postural limitations found by Dr. Stevens.

The Seventh Circuit has "repeatedly cautioned that a person's ability to perform daily activities, especially if they can be done only with significant limitations, does not necessarily translate into an ability to work full-time." *Roddy v. Astrue*, 705 F.3d 631, 639 (7th Cir. 2013) (citations omitted); *Bjornson v. Astrue*, 671 F.3d 640, 647 (7th Cir. 2012) ("The critical differences between activities of daily living and activities in a full-time job are that a person has more flexibility in scheduling the former than the latter, can get help from other persons . . . , and is not held to a minimum standard of performance, as she would be by an employer."). Here, the ALJ concluded Juza's activities of daily living suggested that she could perform the full range of light work but failed to explain how her ability to prepare simple meals, clean, do laundry, shop, and walk in her neighborhood translates into her being able to work a full time job or is inconsistent with the postural limitations found by Dr. Stevens. Because Juza's activities of daily living are critical to the assessment of Dr. Stevens' opinion, the ALJ must thoroughly discuss her activities before using them to discredit the postural limitations Dr. Stevens found. This is not to say that Juza is disabled, only that the ALJ failed to create a logical bridge between the evidence and the RFC conclusion. This error would ordinarily necessitate remand.

The Commissioner argues, however, that even if the ALJ erred in failing to include the postural limitations found by Dr. Stevens in his RFC, the error was harmless since some or all of her previous jobs did not require activities precluded by those limitations. I agree. It is not enough to show that the ALJ erred in order for the court to reverse the Commissioner's decision. "[A]dministrative error may be harmless." *McKinzey v. Astrue*, 641 F.3d 884, 892 (7th Cir. 2011).

It is a waste of both time and resources for the court to remand a case for further specification when it is clear that the ALJ will reach the same result. *Id.* That is the case here. The regulations provide that a claimant is not disabled if it is determined at step four of the sequential evaluation that she can perform her past relevant work either as she actually performed it or as it is generally performed in the national economy. 20 C.F.R. § 404.1560(b). The claimant has the burden of showing that she could not perform her past relevant work. *See* 20 C.F.R. § 404.1512(a); 20 C.F.R. § 404.1520(a)(4)(i)–(iv).

At the hearing Juza testified that her last two jobs were at assisted living facilities for elderly who were more mobile than those in a nursing home and her role was dispensing medication. R. 32–34. Juza next worked third shift at a boys group home where her job was essentially to watch the teenagers who were court ordered to the home. Though she was told she could not do the job, she testified that she was actually terminated when those in charge became upset about the way she documented an occurrence that could have cost them their jobs. R. 35. The third job Juza described was at a payday loan store where she worked as a counter clerk handling the paperwork that customers completed in order to apply for a loan. R. 36. She also described jobs she held stocking shelves at a grocery store as a stock clerk. R. 39. The VE testified that Juza's jobs at the assisted living facilities and the group home would be classified as semi-skilled, medium work but were performed within the light classification. R. 56–57. Her job as a counter clerk at the payday loan store would be classified as light work that would fall into the clerk general classification. R. 57.

This evidence amply supports the ALJ's conclusion that Juza was capable of performing past work. Juza notes that in her written description of the work she performed as a CNA she stated she had to be on her feet eight hours a day and lift as much as 100 pounds to transfer a patient from a

bed to a chair or toilet. ECF No. 29 at 7 (citing R. 349). Juza also contends that the ALJ ignored the fact that her work at the group home required her to clean bathrooms and scrub kitchen floors, and she was required to prevent teenage boys from escaping. *Id.* (citing R. 350). Stock clerk also required her to be on her feet eight hours a day. Based on this evidence, Juza contends the ALJ's error cannot be found harmless.

To be sure, if Juza's written submission was an accurate description of her duties, the ALJ's conclusion that her current RFC would allow her to perform such work would be erroneous. But the written submission differs from Juza's testimony concerning what that job required. She testified that the people she assisted were more mobile than those in a nursing home and her job was dispensing medication. As the discussion of the ALJ's assessment of her credibility shows, there was good reason not to credit everything Juza said. But even if one were to accept her written description and exclude the CNA position, the evidence clearly shows that Juza could perform the jobs she held both at the group home and at the payday loan office.

Juza testified at the hearing that her job at the group home was third shift and she was required only to keep watch over the residents, not provide security or physically restrain them. R. 34–35. This is consistent with her written description of the job which she described as talking with teenage boys but mostly sitting after they were in bed. R. 350. In the space for a description of her lifting and carrying activities, she noted that she "only had to lift a scrub pail when she cleaned the bathrooms and mopped the kitchen floor." *Id.* When asked how many hours each day she was required to kneel, crouch, or crawl, she answered "none." *Id.* Likewise, the activity required for the job she held at the payday loan agency, which the ALJ erroneously referred to as "stock clerk" in his decision (R. 18), fell well within the RFC determined by the ALJ even if we include the minor

17

postural limitations from Dr. Stevens' report. In neither of these jobs, by Juza's own admission, was she required to more than frequently climb stairs, stoop, kneel or crawl, or more than occasionally climb ladders, ropes or scaffolds.

Under these circumstances and in view of the record as a whole, I am satisfied that any error on the part of the ALJ in failing to include in the RFC the postural limitations found by Dr. Stevens was harmless. Remanding for this reason would be a waste of both time and resources. This is especially true in light of the fact that virtually all remands are followed by motions for the claimant's attorney's fees under the Equal Access to Justice Act (EAJA), 28 U.S.C. § 2412, which as a practical matter are granted almost as a matter of course and usually on stipulation of the parties. *See Social Security Administration (SSA) Data for Equal Access to Justice Act Payments*, Social Security Administration, https://www.ssa.gov/open/data/EAJA.html (last updated Jan. 31, 2018) (showing EAJA payments in social security cases of $42 million for fiscal 2017).

## IV. Assessment of Dr. Krawiec's Opinion

Juza also challenges the ALJ's assessment of the opinions offered by Dr. Krawiec, who conducted a consultative evaluation of her. The ALJ gave little weight to the opinion of Dr. Krawiec that Juza "may have some difficulty carrying out job instructions due to attention difficulties because he did not note any objective signs of attention problems during his exam." R. 15. In support of this conclusion the ALJ noted that Dr. Krawiec stated that Juza "did not display any notable difficulty with attention, concentration, or memory during the evaluation I completed with her." R. 478. Absent such difficulty, it made little sense to impose limitations on her capacity to carry out instructions. But even if the ALJ had given weight to Dr. Krawiec's opinion, it would be of little help to Juza. Dr. Krawiec only said that she "*might* have difficulty getting along with coworkers,

supervisors, etc." and that "persisting at tasks and maintaining adequate pace *might* be difficult to the degree that ADHS symptoms would interfere there." *Id.* (emphasis added). This tentative suggestion that Juza could possibly have difficulties in these areas is hardly sufficient so as to require a finding that she would in fact have even mild problems with the tasks at issue.

This is especially the case since Dr. Krawiec's suggestion of possible difficulties Juza might have was directly contradicted by Dr. Hauer's unequivocal opinion that Juza had no limitations in any of the first three functional areas and no episodes of decompensation, meaning that she did not have a severe mental impairment. R. 54–55. The ALJ gave great weight to Dr. Hauer's testimony because he had the opportunity to review the entire record, which indicated that she had almost no mental health treatment despite complaints of lifelong learning disability and attention problems. R. 15. The ALJ stated that Juza's ability to obtain three college degrees and perform semi-skilled and skilled work despite these complaints, together with her remaining highly functional even without treatment, supported Dr. Hauer's testimony. The ALJ's assessment of Dr. Krewiec's opinion was quite reasonable in light of the entire record. There is nothing improper in crediting a non-examining testifying expert's opinion more than even a treating physician where the treating physician's opinion is not well supported. *See White v. Barnhart*, 415 F.3d 654 (7th Cir. 2005). The ALJ gave good reasons for doing so here, and his assessment must therefore stand.

## V. Credibility of Juza's Complaints of Pain

Finally, Juza contends that the ALJ erred in his assessment of her subjective complaints of back pain. Juza testified at the hearing that she had low back pain as a result of a torn disc at L4-L5. R. 41. She testified the pain is brought on by "sitting too long, standing too long, pushing, scrubbing floors." R. 42. She claimed she had been having trouble with her back since 2005 and 2007 when

she was injured in car accidents. *Id.* As for medication, Juza testified that she was "filling up with ibuprofen and trying different stuff but now I'm told I can't have any NSAIDs, so it's really hard." R. 42–43.

Additional statements are contained in the reports Juza submitted to the SSA. In the first of the two Adult Function Reports she submitted on June 27, 2013, Juza listed no physical limitations. R. 339–46. In fact, she said she tried to read and walk daily, and would walk in the neighborhood for exercise. R. 343. When she added her back pain as an impairment after the initial denial, Juza submitted another Adult Function Report four months later on November 29, 2013. R. 397–404. In the second report, Juza claimed she had "constant low back pain and left butt cheek pain." R. 401. The back pain affected virtually all of her physical activities such that she needed to rest after walking from her apartment to her car in the parking lot. If she drove to the store, she'd feel pain when she got out of the car and sometimes would have to rest a couple hours. R. 402. In a Pain Questionnaire submitted the same day, Juza said she had pain every day all the time. R. 405. She claimed that when she had insurance she took Tramadol, Vicodin, and Oxycodone, but they made her sleepy. R. 406. She stated she was currently using ibuprofin, pain patches and Excedrin-Extra Strength for her constant headaches. R. 407–08. Clearly, if the ALJ accepted the statements in Juza's second Adult Function report and Pain Questionnaire as true, she would be disabled.

The Social Security regulations distinguish between symptoms, signs, and laboratory findings. 20 C.F.R. § 404.1529. Symptoms, such as pain, fatigue, shortness of breath, weakness or nervousness, are the claimant's own description of her impairments. *Id.* §§ 404.1529(a)–(b). "Signs are anatomical, physiological, or psychological abnormalities which can be observed, apart from your statements (symptoms)." *Id.* § 404.1529(b). Signs are shown by medically acceptable clinical

diagnostic techniques. *Id.* Laboratory findings are anatomical, physiological, or psychological phenomena which can be shown by the use of medically acceptable laboratory diagnostic techniques such as chemical tests, electrophysiological studies (electrocardiogram, electroencephalogram, etc.), roentgenological studies (x-rays), and psychological tests. *Id.* § 404.1528(c).

The regulations set forth a two-step procedure for evaluating a claimant's statements about the symptoms—her subjective complaints—allegedly caused by her impairments. *See* 20 C.F.R. § 416.1529. The ALJ first determines whether a medically determinable impairment "could reasonably be expected to produce the pain or other symptoms alleged." *Id.* § 404.1529(a). If so, the ALJ then "evaluate[s] the intensity and persistence" of the claimant's symptoms and determines how they limit the claimant's "capacity of work." *Id.* § 404.1529(c)(1). In evaluating the intensity and persistence of a claimant's symptoms, the ALJ looks to "all of the available evidence, including your history, the signs and laboratory findings, and statements from you, your treating and nontreating source, or other persons about how your symptoms affect you." *Id.* The ALJ also considers medical opinions. *Id.* The ALJ then determines whether the claimant's statements about the intensity, persistence, and limiting effects of her symptoms are consistent with the objective medical evidence and the other evidence of record. SSR 16–3p.

On judicial review of the ALJ's decision, the court is not to reweigh the evidence, resolve conflicts, decide questions of credibility, or substitute its judgment for that of the Commissioner. *Rice v. Barnhart*, 384 F.3d 363, 369 (7th Cir. 2004). Because the ALJ is in the best position to determine the credibility of witnesses, the court reviews that determination deferentially, although its review is less deferential when the credibility determination is based upon objective factors, as opposed to subjective considerations. *Craft v. Astrue*, 539 F.3d 668, 678 (7th Cir. 2008). Still, the

question is not whether the court agrees with the ALJ, or whether the ALJ's analysis eliminates all possibility of error. Given the non-adversary nature of the disability adjudication process, the latter standard could seldom be met. In many cases, especially the relatively small percentage of the total claims that go to hearing, the determination of the claimant's true functional capacity rests primarily on the claimant's description of her symptoms offered either directly through the claimant, or indirectly through the claimant's friends and/or family, or through the health care professionals whose training and professional interest strongly encourage acceptance of their patient's description of her symptoms. Medical evidence, in many cases, reveals only the existence of an impairment; not its limiting effects, and only rarely is evidence from a disinterested third party available. *See, e.g.*, *Krause v. Berryhill*, No. 16–C–226, 2017 WL 3189450 (E.D. Wis. July 27, 2017) (affirming termination of DIB based on OIG investigation for VA showing claimant engaged in activities inconsistent with claimed incapacity). As a result, courts "merely examine whether the ALJ's determination was reasoned and supported." *Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008) (citing *Jens v. Barnhart*, 347 F.3d 209, 213–14 (7th Cir. 2003)). "It is only when the ALJ's determination lacks any explanation or support that we will declare it to be patently wrong . . . and deserving of reversal." *Id.* at 413–14 (internal quotations and citations omitted).

Following the Agency's two-step procedure for assessing a claimant's symptoms set out in SSR 16-3p, the ALJ in this case concluded at step one that Juza's medically determinable impairments could reasonably be expected to cause the alleged symptoms. R. 17. At step two, the ALJ found that her statements concerning the intensity, persistence, and limiting effects of these symptoms were not entirely credible for reasons explained in the decision. *Id.* In reaching the latter

conclusion, the ALJ emphasized the lack of treatment and Juza's "relatively active lifestyle" as reasons for his assessment of Juza's claimed symptoms. R. 17.

The absence of any treatment records for the severe, disabling back pain Juza claimed she had been experiencing for years is a proper consideration in assessing whether such claims are true. *See Sienkiewicz v. Barnhart*, 409 F.3d 798, 804 (7th Cir. 2005) ("[A] discrepancy between the degree of pain claimed by the applicant and that suggested by medical records is probative of exaggeration."). Juza claimed she had been having significant back problems, including a "torn disc," since 2005 or 2007. Yet, she produced no medical records showing that she had ever been treated for back pain. Even the MRI showing the allegedly "torn disc" was never produced. Although she asserted all the treatment she had received for this problem was at Prevea, the only record Prevea produced was the January 19, 2014 emergency room visit for a sore throat that mentioned only an old injury to the cervical spine, not the lumbar. R. 483–90. In fact, the only medical evidence of any problem with her back was the report Dr. Rosteing prepared at the request of the SSA.

Juza suggests that the absence of any treatment records can be explained by the fact that she is indigent and has no health insurance. But Juza never said she did not receive treatment for her back problem because she had no insurance; to the contrary, she claimed she did receive treatment. She said she only had one cortisone shot because the insurance she had at the time didn't pay for it and because she was told it could build up in her system. R. 42. She also said she saw a specialist who diagnosed her with arthritis. She also claims to have had physical therapy. *Id.* Yet, when the SSA requested records from the clinic she said provided her treatment, the Agency was told no such records existed. This would seem a strong reason to doubt her statements.

The ALJ also thought Juza's "relatively active lifestyle" constituted evidence that her statements concerning the frequency, duration and intensity of her pain were exaggerated. He noted that "despite her alleged back pain, the claimant reported that she prepares simple meals, cleans, does laundry, shops in stores for necessities, and walks in her neighborhood. R. 17. While these activities may not be inconsistent with the mild postural limitations that Dr. Stevens found, they are inconsistent with the severe, constant, and disabling back pain that Juza was claiming in her reports. The ALJ did not conclude that her admitted activities demonstrated she could work full time at a job requiring the full range of work at the light exertional level. He concluded that her admitted activities were inconsistent with her statements that she was in constant and disabling pain. It is not unreasonable to conclude that someone experiencing the degree of pain Juza claimed would not expend energy taking a walk in the neighborhood, or even cleaning their home and doing laundry any more than absolutely necessary. *See Pepper*, 712 F.3d at 369 (agreeing with ALJ's reasoning that claimant's daily activities undermined her testimony about extent of her symptoms). At least I cannot say the ALJ's assessment of Juza's statements is patently wrong.

One final matter deserves comment. Juza argues that the ALJ erred in failing to take into consideration her steady eighteen-year work record. ECF No. 20 at 12. In fact, the record reflects a sporadic work record, as Juza conceded in her testimony and during her interview with Dr. Krewiec. Regardless, the ALJ did not commit reversible error by failing to explicitly discuss Juza's work history when evaluating her credibility. *See Stark v. Colvin*, 813 F.3d 684, 689 (7th Cir. 2016) ("An ALJ is not statutorily required to consider a claimant's work history . . . ."). Although a consistent work history weighs in favor of a positive credibility finding, it is still just "one factor

among many, and it is not dispositive." *Loveless v. Colvin*, 810 F.3d 502, 508 (7th Cir. 2016); *see also Summers v. Berryhill*, 864 F.3d 523, 528–29 (7th Cir. 2017).

## CONCLUSION

For all of the above reasons, the decision of the Commissioner is affirmed. The Clerk is directed to enter judgment accordingly.

Dated this  _21st_  day of February, 2018.

s/ William C. Griesbach
William C. Griesbach, Chief Judge
United States District Court
